UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

MAID O'CLOVER, INC., Debtor, a Washington corporation, et al.,

Plaintiffs,

v.

CHEVRON USA INC., d/b/a CHEVRON PRODUCTS COMPANY, a Pennsylvania corporation, et al.,

Defendants.

NO. CV-03-3077-EFS

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT CHEVRON U.S.A, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT DISMISSAL OF PLAINTIFFS' CLAIMS BASED ON ALLEGED MISREPRESENTATIONS**

On August 17, 2005, the Court heard oral argument on Defendant Chevron U.S.A., Inc.'s Motion for Partial Summary Judgment Dismissal of Plaintiffs' Claims Based on Alleged Misrepresentations ("Misrepresentation Motion"), (Ct. Rec. 162). Mr. Randall P. Beighle and Ms. Mary Jo Heston appeared on behalf of Defendant Chevron U.S.A., Inc. ("Chevron"), while Plaintiffs Maid O'Clover, Inc. ("MOCC"), Maid O'Clover, South, Inc. ("MOCS"), and Maid O'Clover, East, Inc. ("MOCE"), collectively referred to as "MOC," were represented by Mr. James Perkins and Mr. Deihl R. Rettig. After reviewing the submitted material, taking oral argument, and considering relevant authority, the Court is fully informed and hereby **grants in part** and **denies in part** Chevron's Misrepresentation Motion, (Ct. Rec. 162).

**I. Background**

Prior to filing for bankruptcy in late 2002, MOC owned and operated twenty retail motor fuel outlets across Eastern Washington. Fourteen of MOC's stations sold Chevron branded motor fuel and were primarily located in Yakima, Wenatchee, and Spokane, Washington. MOC consisted of three independent corporations, MOCC, MOCS, and MOCE, each of which owning several of the Chevron branded stations. For the most part, the three MOC entities were owned by Mr. Jeff Louden and Mr. Guy Louden. Prior to 1995, MOC purchased motor fuel directly from Chevron, which delivered the fuel to MOC's stations. The MOC's stations were "direct-served" during that period.

In 1993, Chevron approached Mr. Jeff Loudon, then MOC's chief officer, indicating it planned to discontinue selling motor fuel directly to retail outlets and asked MOC to become jobber-served. Jobbers are companies who purchase motor fuel directly from Chevron at wholesale prices, which are also known as "rack" prices, and then usually resell the fuel to third-party retail outlets in the jobbers' coverage area. Jobbers are responsible for obtaining the fuel at a wholesale distribution site and then delivering the fuel to their retail outlet customers.

After MOC was notified of Chevron's pending jobber conversion, MOC negotiated and entered an agreement ("1995 Jobber Agreement") on May 12, 1995, naming MOCS as a jobber. MOCS was allowed to purchase fuel at Chevron's Spokane, Pasco, and Seattle distribution sites for whatever price Chevron was selling motor fuel at on the day of purchase. MOCS then sold and delivered motor fuel to MOCS's, MOCC's, and MOCE's retail

outlets. MOCS did not mark-up the wholesale price in its sales to MOCC and MOCE. Beginning in 1998, MOCS also began delivering and selling motor fuel to the Ahtanum General Store.

In 1995, near the time MOCS entered into the 1995 Jobber Agreement, MOCS also entered into several facility improvement loan agreements with Chevron, which totaled over $3.1 million dollars. As part of these agreements, MOC's stations benefitting from the loans had to comply with Chevron's Hallmark 21 retail image standards. Additionaly, in 1995, MOC agreed to rent and use Chevron's credit card processing equipment and services. The jobber agreement and credit card equipment/service agreements were renewed in 1998 and 2000.

After MOC became jobber-served in 1995, it became increasingly less profitable until it reached a point in late 2002, when all three MOC entities filed for Chapter 11 bankruptcy. Thereafter, in January 2003, MOC commenced this case. In its Complaint, MOC alleged causes of action against Chevron based on (1) violations of the Washington Franchise Investment Protection Act (R.C.W. § 19.100); (2) violations of the Washington Gasoline Dealer Bill of Rights Act (R.C.W. § 19.120); (3) violations of the Consumer Protection Act (R.C.W. § 19.86); (4) negligence; (5) negligent misrepresentation; and (6) contractual breach of the duty of good faith and fair dealing.

## II. Analysis

### A. Standard of Review

Summary judgment will be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). When considering a motion for summary judgment, a court may not weigh the evidence nor assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A genuine issue for trial exists only if "the evidence is such that a reasonable jury could return a verdict" for the party opposing summary judgment. *Id.* at 248. In other words, issues of fact are not material and do not preclude summary judgment unless they "might affect the outcome of the suit under the governing law." *Id.* There is no genuine issue for trial if the evidence favoring the non-movant is "merely colorable" or "not significantly probative." *Id.* at 249.

If the party requesting summary judgment demonstrates the absence of a genuine material fact, the party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial" or judgment may be granted as a matter of law. *Anderson*, 477 U.S. at 248. This requires the party opposing summary judgment to present or identify in the record evidence sufficient to establish the existence of any challenged element that is essential to that party's case and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Failure to contradict the moving party's facts with counter affidavits or other responsive materials may result in the entry of summary judgment if the party requesting summary

judgment is otherwise entitled to judgment as a matter of law. *Anderson v. Angelone*, 86 F.3d 932, 934 (9th Cir. 1996).

**B. Negligent Misrepresentation: Generally**

"Washington has adopted the *Restatement (Second) of Torts* sections 551 and 552 (1977) as the standards for claims of negligent misrepresentation." *Richland Sch. Dist. v. Mabton Sch. Dist.*, 111 Wash. App. 377, 385 (2002) (citing *Havens v. C. & D. Plastics, Inc.*, 124 Wash. 2d 158, 180 (1994) and *Colonial Imps., Inc. v. Carlton N.W., Inc.*, 121 Wash. 2d 726, 731 (1993)). "In order to sustain a claim under these sections, the plaintiff must establish, in part, a duty to disclose or to provide accurate information." *Id.* Chevron asks the Court to grant summary judgment with regard to MOC's claims of negligent misrepresentation stemming from alleged false statements and material omissions Chevron made concerning their potential jobber relationship and related wholesale pricing practices.

**1. Restatement (Second) of Torts § 552: False Statements**

A defendant

> who, in the course of his business, profession or employment in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

RESTATEMENT (SECOND) OF TORTS § 552. Thus, under the Restatement (Second of Torts § 552, a plaintiff must prove it was supplied false information and it justifiably relied on that information to prove negligent misrepresentation liability on the part of a defendant.

In this matter, MOC claims Chevron provided false information that caused MOC to enter the 1995 Jobber Agreement, when it otherwise would not have done so had it been provided with accurate information. MOC's allegations of false statements, found in the Complaint and several discovery responses provided by Chevron, include the following: (1) MOC would pay less for gasoline if jobber-served, rather than being directly served by Chevron; (2) MOC would not be adversely affected by the 1995 jobber conversion; (3) Chevron implied its wholesale rack price would allow MOC to compete in the retail marketplace; and (4) Chevron considered MOC's competitors' street prices in setting wholesale rack prices, including the regular taking of street price surveys. Without admitting it made such representations, Chevron argues they nonetheless may not serve as the basis of a negligent misrepresentation claim because they were merely opinions and MOC should not have relied on them even if they were made.

**a. False Statements & the *Markov* Exception**

Generally, false statements under a claim of negligent misrepresentation must relate to pre-existing or presently-existing facts. *Donald B. Murphy Contractors, Inc. v. King County*, 192 Wash. App. 192, 197-98 (2002) ("a false representation as to a presently existing fact is a prerequisite to a misrepresentation claim"). Presently existing facts are distinguished by the following test:

> Where the fulfillment or satisfaction of the thing represented depends upon a promised performance of a future act, or upon the occurrence of a future event, or upon future requirements of the representee, then the representation is not of an existing fact.

*Nyquist v. Foster*, 44 Wash. 2d 465, 471 (1954). Thus, promissory statements of future performance or potentially occurring events are not typically actionable under a theory of negligent misrepresentation. However, an exception to the general rule was expressed in *Markov v. ABC Transfer & Storage Co.*, 76 Wash. 2d 388 (1969).

In *Markov*, the Washington State Supreme Court declared there "are times when the law demands of one an honest declaration of future intentions." *Id.* at 388. Accordingly, if a "promise is made without care or concern whether it will be kept, and the promisor knows or under the circumstances should know that the promisee will be induced to act or refrain from acting to his detriment, the promise will . . . support an action by the promisee." *Id.* at 396.

Chevron claims most of the representations alleged by MOC were statements regarding future events and do not constitute false statements for purposes of proving negligent misrepresentation. MOC counters by claiming the alleged representations were either (1) related to existing facts or (2) fell within the *Markov* exception as promises Chevron knew or should have known would induce MOC to enter the 1995 Jobber Agreement.

Chevron claims the *Markov* exception requires MOC to prove Chevron made the alleged statements with intent to deceive or no intention of performing. Chevron's claim is made in error. *Markov* describes two separate instances when future promises may be actionable as misrepresentations: first, when "a promise is made for the purpose of deceiving and with no intention to perform," or second, when a "promise is made without care or concern whether it will be kept." *Id.* These are

two distinct standards and MOC need not fulfill both as suggested by Chevron.

Aside from the alleged representation Chevron was considering competitor's street prices with regard to setting jobber prices, the Court believes all other representations related to future promises. Thus, most alleged statements are actionable as negligent misrepresentations only if they fall within the *Markov* exception. The Court disagrees with Chevron's argument that MOC failed to meet its burden of demonstrating the *Markov* exception applies under the circumstances. To maintain this cause of action under *Markov*, MOC need only show a genuine dispute of material fact exists with regard to whether Chevron entered the agreement without concern for whether it would keep its alleged promises when it knew or should have known MOC would be induced to enter the 1995 Jobber Agreement as a result of its alleged promises.

MOC has met the burden noted above and summary judgment based on this issue is not appropriate. Mr. Jeff Louden's declaration clearly sets forth sufficient evidence to demonstrate a disputed material issue of fact exists regarding alleged representations made by Chevron after the importance of pricing and competitiveness were emphasized by MOC during negotiations. Additionally, MOC's claim that Chevron represented it was conducting street pricing surveys prior to the 1995 Jobber Agreement is actionable in and of itself as a pre-existing fact. Thus, the Court now considers whether MOC's reliance on those alleged promises was justifiable.

///

**b. Justifiable Reliance**

Under Restatement (Second) of Torts § 552, a plaintiff must prove its reliance on a defendant's false statements was justifiable. Chevron argues, even if the alleged representations were made and were false, MOC was not justified in relying on those representations because the statements were counter to the terms of the 1995 Jobber Agreement, which MOC entered into after receiving advice from a paid consultant. MOC disagrees by rehashing its argument that Chevron made representations concerning street price surveys it knew it was not and would not be conducting, failing to respond to Chevron's 1995 Jobber Agreement-based argument.

"Whether a party justifiably relied upon a misrepresentation is an issue of fact." *Alejandre v. Bull*, 123 Wash. App. 611, 625 (2004). Unless reasonable minds could only reach one conclusion, questions of fact should be determined only by the trier-of-fact. With regard to the instant matter, the Court believes only one conclusion could be reasonably be drawn with regard to MOC's reliance on Chevron's alleged representations regarding future pricing methodology and grants Chevron's motion for summary judgment with respect to that alleged misrepresentation. However, reasonable minds could disagree regarding the justification of MOC's reliance on Chevron's other alleged misrepresentations and summary judgment is denied with regard to those alleged misrepresentations.

As explained by Chevron, MOC's reliance on Chevron's alleged statement that Chevron would continue considering competitor's street prices was unjustified. The 1995 Jobber Agreement expressly allowed

Chevron to change the method by which MOC's gasoline prices were determined without notice to MOC. (Ct. Rec. 166, Ex. E. ¶ 5.) Consequently, Chevron had no duty to use any particular methodology when setting MOC's gasoline prices once the 1995 Jobber Agreement was entered into. Thus, MOC should not have expected Chevron to consider competitor prices or conduct street pricing surveys as it now contends it expected Chevron to do. For this reason, MOC's reliance on this alleged representation was unjustified and as a matter of law cannot constitute a negligent misrepresentation.

However, even though MOC could not justifiably rely on Chevron's alleged promises of how prices would be determined, reasonable minds may disagree as to whether MOC was justified in relying on other alleged representations. MOC alleges Chevron represented that MOC would not be adversely affected by the jobber conversion, jobber prices would allow it to compete with competitors, and jobber prices would be less than direct-served prices. Although the 1995 Jobber Agreement allowed Chevron to change prices at any time without prior notice to MOC, the agreement did not affirmatively grant Chevron the right change prices for any reason or in any way that would adversely affect MOC. Consequently, it is reasonable to believe MOC could have justifiably relied on Chevron's promises that prices would remain competitive and that MOC would not be adversely affected by the new jobber relationship. Accordingly, Chevron's motion for summary judgment with regard to these alleged misrepresentations is denied.

///

///

**2. Restatement (Second) of Torts § 551: Omissions**

A defendant "who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is [liable for negligent misrepresentation,"] but only if "he is under a duty to the other to exercise reasonable care to disclose the matter in question." RESTATEMENT (SECOND) OF TORTS § 551(1) (1977). A party

> to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated, (a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and (b) matters know to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading[.]

*Id.* § 551(2).

Washington courts find disclosure duties under the standard stated above when (1) there is a quasi-fiduciary relationship, (2) there is a special relationship of trust and confidence has been developed between the parties, (3) one party is relying upon the superior specialized knowledge and experience of the other, (4) a seller has knowledge of a material fact not easily discoverable by the buyer, or (5) there exists a statutory duty to disclose. *Colonial Imps., Inc.*, 121 Wash. 2d at 732. In this matter, MOC not only asserts Chevron made false statements that induced it to enter the 1995 Jobber Agreement, but also that Chevron failed to disclose material facts that would have led MOC to not enter the agreement had the facts been disclosed. Chevron's alleged omissions include, but are not limited to, pricing practices and the threat of emerging hypermarkets. (*See e.g.* Ct. Rec. 166. at Ex. A, ¶ 3.13-3.15.)

Chevron argues no special relationship existed between itself and MOC, nor that it was under a duty to disclose matters described in *Restatement (Second) of Torts* § 551(2). Chevron believes the parties negotiated at arms length and MOC did not rely on Chevron's specialized knowledge or experience. Chevron also asserts (1) Mr. Jeff Loudon and Mr. Guy Loudon were well-educated and sophisticated businessman with extensive experience in the motor fuel industry prior to entering the 1995 Jobber Agreement and (2) MOC had retained an experienced consultant to provide advice regarding its contemplated jobber relationship with Chevron and the new pricing consequences such a relationship might bring.

MOC responds by explaining its belief Chevron owed MOC a duty to fully disclose all material facts bearing on its decision to enter the 1995 Jobber Agreement. MOC explains (1) it had never been a jobber, (2) had no knowledge of how jobber pricing was set by Chevron, (3) Chevron had superior knowledge regarding jobber agreements and pricing, and (4) MOC's consultant was unable to provide accurate advice due to Chevron's alleged failure to disclose material facts related to the 1995 Jobber Agreement.

Certainly, if Chevron had no duty to disclose information regarding its pricing methodology, it cannot be held liable for fraudulently concealing such information. However, the Court denies Chevron's request to make such a finding at this stage of litigation. As evidenced by the parties' disagreement regarding the nature of MOC and Chevron's relationship, genuine disputes of material fact exist as to whether MOC was relying upon the superior specialized knowledge of Chevron and if Chevron had knowledge of a material fact, *i.e.* jobber pricing

methodology, not easily discoverable by MOC. Accordingly, summary judgment is denied on this issue.

**C. Good Faith and Fair Dealing Claims**

In its Complaint, MOC alleges Chevron, in the course of performing its contractual duties, violated its duty of good faith and fair dealing under the Uniform Commercial Code as adopted by Washington, Franchise Investor Protection Act, Gasoline Dealer Bill of Rights Act, and common law of contracts. (Ct. Rec. 166, Ex. A at 4.30-4.35.) MOC did not articulate in specific terms how Chevron failed to act in good faith, but in the instant motion Chevron hypothesizes MOC will attempt to portray the alleged statements discussed above as actionable promises under the 1995 Jobber Agreement. In general, Chevron argues such statements, even if made, were not intended to be part of the final 1995 Jobber Agreement entered into by the parties and are inadmissible under the parol evidence rule. Chevron points to the agreement's inclusion of a merger clause and terms contradicting the earlier representations MOC alleges Chevron made.

In response, MOC claims the context rule, as explained in *Berg v. Hudesman*, 115 Wash. 2d 657 (1990), permits it to introduce Chevron's alleged statements as extrinsic evidence of the parties' intent with regard to the 1995 Jobber Agreement. MOC also argues the alleged statements are admissible to prove the agreement was the product of fraud or misrepresentation.

**1. Parol Evidence and Context Rules**

The parol evidence rule "precludes use of parol evidence to add to, subtract from, modify, or contradict the terms of a fully integrated written contract, *i.e.* one which is intended as a final expression of the

terms of the agreement." *DePhillips v. Zolt Constr. Co.*, 136 Wash. 2d 26, 32 (1998). Thus, when parties reduce their agreement to a final integrated document, all prior or contemporaneous negotiations and agreements effectively merge into that final document and are rendered immaterial by operation of the rule. *Equitable Life Leasing Corp. v. Cedarbrook, Inc.*, 52 Wash. App. 497, 505 (1988). However, when fraud is at issue, parties are not bound by the parol evidence rule, and may present extrinsic evidence to demonstrate they were fraudulently induced to enter the contract. *Buyken v. Ertner*, 33 Wash. 2d 334, 345 (1949) (explaining how the parol evidence rule does not apply when fraud or mutual mistake is claimed). This principle holds true even when a contract contains a merger clause. *Coson v. Roehl*, 63 Wash. 2d 384, 389 (1963) ("fraud vitiates the contract, and the defendants are not foreclosed by the merger clause of the contract from placing reliance upon the fraudulent misrepresentations").

Despite the exclusionary effect of the parol evidence rule, under the context rule, parol or extrinsic evidence "is admissible as to the entire circumstances under which the contract was made, as an aid in ascertaining the parties' intent." *Berg*, 115 Wash. 2d at 667. Thus, extrinsic evidence may be presented to help determine whether a contract is indeed fully integrated and if not, to add those terms that were intended, but not included in the writing. *Lynch v. Higley*, 8 Wash. App. 903, 911 (1973).

**2. Parol Evidence and the 1995 Jobber Agreement**

The 1995 Jobber Agreement includes a merger clause that states: "this agreement terminates and supersedes any prior agreements between

[MOC] and [Chevron] and its affiliates relating to the subject matter hereof . . . .” (Ct. Rec. 166, Ex. E ¶ 21.) The contract also states Chevron “shall have the right at any time without prior notice to [MOC] to change any or all such prices or the method by which [Chevron’s] prices to [MOC] are determined.” *Id.* ¶ 5. MOC would like to introduce evidence of the alleged misrepresentations discussed above regarding street surveys and competitive pricing to “not only evidence parties’ intent prior to executing the 1995 Jobber Agreement, but also to evidence the alleged fraud/misrepresentations.” (Ct. Rec. 169 at 12-13). Meanwhile, Chevron contends the parol evidence rule precludes MOC from claiming any of the alleged misrepresentations constitute actionable promises under the 1995 Jobber Agreement because they would inappropriately add to and/or contradict terms of what Chevron believes is a fully integrated contract. However, Chevron does concede MOC is permitted to introduce evidence of the alleged misrepresentations to prove fraud.

The Court agrees with Chevron’s analysis and finds the 1995 Jobber Agreement to be a fully integrated contract as far as it relates to certain pricing obligations. The agreement includes a merger clause that expressly demonstrates the parties’ intent to supercede and terminate any prior negotiations and agreements related to the new jobber relationship. Additionally, the contract expressly provides Chevron with unbridled discretion to adjust the manner in which it priced motor fuel sold to MOC. Extrinsic promises Chevron would conduct street surveys or otherwise competitively price its gasoline would directly contradict the

contract's terms. Such contradiction is prohibited by the parol evidence rule.

Although MOC is entitled to present extrinsic evidence to demonstrate the parties' intent or that the agreement was not fully integrated, it has failed to do so and merely asks the Court to allow it to admit such evidence in the future. Thus, because MOC has failed to present evidence establishing an issue of material fact is in dispute, the Court grants summary judgment with regard to this issue. The alleged misrepresentations described above are not actionable promises under the 1995 Jobber Agreement and, as such, cannot serve as the basis of MOC's common law bad faith claims. Whether MOC is able to prove Chevron violated its duties of good faith and fair dealing for other reasons is yet to be determined. However, despite the Court's ruling, MOC is not foreclosed from presenting extrinsic evidence of Chevron's alleged misrepresentations for the purposes are demonstrating fraud if such a claim is asserted in its Complaint.

Accordingly, IT IS **HEREBY ORDERED:** Defendant Chevron U.S.A., Inc.'s Motion for Partial Summary Judgment Dismissal of Plaintiffs' Claims Based on Alleged Misrepresentations, **(Ct. Rec. 162)**, is **GRANTED IN PART** (parol evidence to show misrepresentation) and **DENIED IN PART** (false statements, omissions.

**IT IS SO ORDERED.** The District Court Executive is directed to enter this Order and provide a copy to counsel.

**DATED** this 16th day of September, 2005.

S/ Edward F. Shea
EDWARD F. SHEA
United States District Judge