UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| MAID O'CLOVER, INC., Debtor, a Washington corporation, et al., | NO. CV-03-3077-EFS |
| Plaintiffs, | **ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANT CHEVRON U.S.A, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT UNDER THE WASHINGTON FRANCHISE INVESTOR PROTECTION ACT** |
| v. | |
| CHEVRON USA INC., d/b/a CHEVRON PRODUCTS COMPANY, a Pennsylvania corporation, et al., | |
| Defendants. | |

On March 22, 2005, the Court heard oral argument on Plaintiffs' Motion for Partial Summary Judgment ("MOC's FIPA Motion"), (Ct. Rec. 48). Thereafter, on August 17, 2005, the Court heard oral argument on Defendant Chevron U.S.A., Inc.'s Motion for Partial Summary Judgment Under the Washington Franchise Investor Protection Act ("Chevron's FIPA Motion"), (Ct. Rec. 204). At both hearings, Mr. Randall P. Beighle appeared on behalf of Defendant Chevron U.S.A., Inc. ("Chevron"), while Plaintiffs Maid O'Clover, Inc. ("MOCC"), Maid O'Clover, South, Inc. ("MOCS"), and Maid O'Clover, East, Inc. ("MOCE"), collectively referred to as "MOC," were represented by Mr. James Perkins. After reviewing the submitted material, taking oral argument, and considering relevant

ORDER ~ 1

authority, the Court is fully informed and hereby **denies** MOC's FIPA Motion, (Ct. Rec. 48), and **grants in part and denies in part** Chevron's FIPA Motion, (Ct. Rec. 204).

### I. Background

Prior to filing for bankruptcy in late 2002, MOC owned and operated twenty retail motor fuel outlets across Eastern Washington. Fourteen of MOC's stations sold Chevron branded motor fuel and were primarily located in Yakima, Wenatchee, and Spokane, Washington. MOC consisted of three independent corporations, MOCC, MOCS, and MOCE, each of which owning several of the Chevron branded stations. For the most part, the three MOC entities were owned by Mr. Jeff Louden and Mr. Guy Louden. Prior to 1995, MOC purchased motor fuel directly from Chevron, which delivered the fuel to MOC's stations. The MOC's stations were "direct-served" during that period.

In 1993, Chevron approached Mr. Jeff Loudon, then MOC's chief officer, indicating it planned to discontinue selling motor fuel directly to retail outlets and asked MOC to become jobber-served. Jobbers are companies who purchase motor fuel directly from Chevron at wholesale prices, which are also known as "rack" prices, and then usually resell the fuel to third-party retail outlets in the jobbers' coverage area. Jobbers are responsible for obtaining the fuel at a wholesale distribution site and then delivering the fuel to their retail outlet customers.

After MOC was notified of Chevron's pending jobber conversion, MOC negotiated and entered an agreement ("1995 Jobber Agreement") on May 12, 1995, naming MOCS as a jobber. MOCS was allowed to purchase fuel at

Chevron's Spokane, Pasco, and Seattle distribution sites for whatever price Chevron was selling motor fuel at on the day of purchase. MOCS then sold and delivered motor fuel to MOCS's, MOCC's, and MOCE's retail outlets. MOCS did not mark-up the wholesale price in its sales to MOCC and MOCE. Beginning in 1998, MOCS also began delivering and selling motor fuel to the Ahtanum General Store.

In 1995, near the time MOCS entered into the 1995 Jobber Agreement, MOCS also entered into several facility improvement loan agreements with Chevron, which totaled over $3.1 million dollars. As part of these agreements, MOC's stations benefitting from the loans had to comply with Chevron's Hallmark 21 retail image standards. Additionally, in 1995, MOC agreed to rent and use Chevron's credit card processing equipment and services. The jobber agreement and credit card equipment/service agreements were renewed in 1998 and 2000.

After MOC became jobber-served in 1995, it became increasingly less profitable until it reached a point in late 2002, when all three MOC entities filed for Chapter 11 bankruptcy. Thereafter, in January 2003, MOC commenced this case. In its Complaint, MOC alleged causes of action against Chevron based on (1) violations of the Washington Franchise Investment Protection Act (R.C.W. § 19.100); (2) violations of the Washington Gasoline Dealer Bill of Rights Act (R.C.W. § 19.120); (3) violations of the Consumer Protection Act (R.C.W. § 19.86); (4) negligence; (5) negligent misrepresentation; and (6) contractual breach of the duty of good faith and fair dealing.

///
///

ORDER ~ 3

## II. Analysis

**A. Standard of Review**

Summary judgment will be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  When considering a motion for summary judgment, a court may not weigh the evidence nor assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A genuine issue for trial exists only if "the evidence is such that a reasonable jury could return a verdict" for the party opposing summary judgment. *Id*. at 248.  In other words, issues of fact are not material and do not preclude summary judgment unless they "might affect the outcome of the suit under the governing law." *Id.*  There is no genuine issue for trial if the evidence favoring the non-movant is "merely colorable" or "not significantly probative." *Id.* at 249.

If the party requesting summary judgment demonstrates the absence of a genuine material fact, the party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial" or judgment may be granted as a matter of law. *Anderson*, 477 U.S. at 248.  This requires the party opposing summary judgment to present or identify in the record evidence sufficient to establish the existence of any challenged element that is essential to that party's case and for which

1   that party will bear the burden of proof at trial. *Celotex Corp. v.*
2   *Catrett*, 477 U.S. 317, 322-23 (1986).  Failure to contradict the moving
3   party's facts with counter affidavits or other responsive materials may
4   result in the entry of summary judgment if the party requesting summary
5   judgment is otherwise entitled to judgment as a matter of law. *Anderson*
6   *v. Angelone*, 86 F.3d 932, 934 (9th Cir. 1996).

7   **B. The FIPA Motions**

8       MOC moves the Court to declare a franchise relationship, under FIPA,
9   existed between itself and Chevron.  In doing so, MOC alleges (1) it was
10  granted the right to sell goods under a marketing plan suggested by
11  Chevron, (2) the operation of MOC's business was substantially associated
12  with Chevron's trademark, and (3) MOC paid or agreed to pay a franchise
13  fee.  MOC claims it "has paid numerous fees for the right to sell Chevron
14  gasoline[,]" but only discusses five such fees.  These fees include (a)
15  RAN System fees, (b) credit card processing fees, (c) payment for
16  Chevron's Commitment to Service Excellence Program, (d) pooled or co-op
17  advertising fees, and (e) overpriced wholesale motor fuel charges. *Id.*

18      Chevron does not believe MOC paid any franchise fees to Chevron and
19  accordingly does not believe a franchise relationship existed under FIPA.

20  **C. FIPA Requirements**

21      FIPA "is a comprehensive scheme of franchise regulation that places
22  specific obligations upon a franchisor and rights in a franchisee."
23  *Blanton v. Mobil Oil Corp.*, 721 F.2d 1207, 1212 (9th Cir. 1983).  Thus,
24  a threshold question in determining whether MOC's FIPA claims may be
25  maintained is whether MOC and Chevron were parties to a franchise with
26  one another.  Under FIPA, a "franchise" is defined as follows:

> *An agreement, express or implied, oral or written, by which:*
> (i) A person is granted the right to engage in the business of
> offering, selling, or distributing goods or services under a
> marketing plan prescribed or suggested in substantial part by
> the grantor or its affiliate; (ii) The operation of the
> business is substantially associated with a trademark, service
> mark, trade name, advertising, or other commercial symbol
> designating, owed by, or licensed by the grantor or its
> affiliate; and (iii) *The person pays, agrees to pay, or is
> required to pay, directly or indirectly, a franchise fee.*

R.C.W. § 19.100.010(4)(a) (emphasis added). FIPA also excludes several franchise-like relationships from FIPA coverage. *Id.* § 19.100.010(4)(b). One such relationship relates to transactions involving credit cards. *Id.* § 19.100.010(4)(b)(i). Chevron does not dispute the presence of the first two franchise requirements listed above, but it does contend the third requirement was never fulfilled because no franchise fees were ever paid by MOC and that its dealings with MOC are excepted under the credit card exception. Thus, the Court's analysis is primarily limited to determining whether franchise fees were paid in considering the parties' two motions. Only if the Court determines franchise fees were paid need it consider whether MOC is entitled to judgment as a matter of law on the other two statutory franchise requirements.

FIPA defines a "franchise fee" as "any fee or charge that a franchisee or subfranchisor is required to pay or agrees to pay for the right to enter into a business or to continue a business under a franchise agreement. . . ." *Id.* § 19.100.010(12). The statute's definition of franchise fees is broad and has been interpreted as including "fees hidden in the franchisor's charges for goods or services." *Blanton*, 721 F.2d at 1220 (quoting *Lobdell v. Sugar 'N Spice, Inc.*, 33 Wash. App. 881, 892 (1983)). Furthermore, FIPA explicitly describes several *per se* examples of franchise fees, which include

ORDER ~ 6

> the payment either in lump sum or by installments of an initial capital investment fee, any fee or charge based upon a percentage of gross or net sales whether or not referred to as royalty fees, any payment for the mandatory purchase of goods or services or any payment for goods or services available only from the franchisor or any training fees or training school fees or charges. . . .

*Id.* § 19.100.010(12). MOC asserts that several payments made to Chevron fall within the purview of these examples or at least constitute "hidden fees."

Despite the broad definition of "franchise fee," FIPA expressly excepts several fees from consideration. Specifically, the statute states

> the following shall not be considered payment of a franchise fee; (a) the purchase or agreement to purchase goods at a bona fide wholesale price; . . . [and] (e) the purchase or lease or agreement to purchase or lease supplies or fixtures necessary to enter into the business or to continue the business under the franchise agreement at their fair market or rental value. . . ."

*Id.* § 19.100.010(12). Chevron relies in part on these two exceptions to support its claim that no franchise fees were paid.

In the instant motions, the Court is asked to determine whether an agreement existed under which MOC was required or agreed to pay a franchise fee. In answering this question, the Court must consider all charges imposed on MOC by Chevron and determine whether those charges constituted a franchise fee under FIPA. This inquiry requires the Court to determine whether the charges were required by Chevron or agreed to be paid by MOC for the right to enter a business under a franchise agreement. Additionally, the Court must consider all pertinent FIPA exceptions to determine whether the MOC-Chevron relationship and/or

ORDER ~ 7

transactions constituted a franchise or franchise fees. The Court addresses the parties' relationship and transactions below.

**D. Credit Card Exception**

FIPA's definition of a franchise expressly excludes the "payment of a reasonable service charge to the issuer of a credit card by an establishment accepting or honoring such credit cards or *any transaction relating to a bank credit card plan*." R.C.W. 19.100.010(4)(b)(I) (emphasis added). "Bank credit card plan" is defined as a "credit plan in which the issuer of credit cards is a national back, state bank, trust company or any other banking institution. . . ." *Id.* § 19.100.010(6). Evidenced by the statute's expansive definitions, FIPA broadly excludes the consideration of most credit card transactions from determining whether a franchise relationship exists.

In this case, MOC claims fees charged by Chevron to rent credit card processing equipment and associated with the processing of third-party issued credit cards, *i.e.* Visa, Mastercard, etc., constitute franchise fees. However, because these fees are transactions related to bank credit card plans as defined by FIPA, they cannot form the basis of a franchise relationship. Accordingly, the Court grants summary judgment on this issue to Chevron, holding the credit card exception found in R.C.W. § 19.100.010(4)(b)(i) applies to these alleged fees and they do not constitute franchise fees under FIPA.

**E. Retail Automation System ("RAN System") Rental Fees**

Even if the credit card exception does not apply to the equipment rentals made by MOC, the Court concludes these charges do not constitute franchise fees in and of themselves. The RAN System includes all

hardware and software necessary to process customer's Chevron credit cards.  The RAN System is also capable of processing numerous other third-party credit cards.  Chevron is in the business of renting the RAN System to Chevron retailers for varying costs depending on the sophistication of RAN System rented.  MOC entered agreements to rent the RAN System from Chevron in 1995, 1998, and 2000.

MOC believes the rental and training fees associated with the RAN System constitute franchise fees.  In support of its claim, MOC points to three *per se* examples of franchise agreements described in FIPA.  MOC specifically believes the charges associated with using the RAN System equipment were (1) mandatory payments for goods or services available only from the franchisor and (2) training fees.  Chevron disagrees with MOC's analysis, arguing MOC was not required to use the RAN System, but instead freely chose to.  Chevron also reports that all initial RAN System training was free and MOC was only charged a fee if it desired additional training.  Furthermore, Chevron explains, even if charges associated with the RAN System are deemed mandatory, they do not constitute a franchise fee because the service was offered at fair market value.

The Court believes the parties confuse the issue of whether the RAN System charges constituted a franchise fee by focusing on whether its use was mandatory or not.  By statutory definition, franchise fee includes any fee or charge the franchisee "is required to pay *or agrees* to pay for the right to enter into a business. . . ." R.C.W. § 19.100.010(12). Here, it is immaterial whether MOC was required to use the RAN System or not, because it is clear MOC *agreed* to pay for the use the system for the

right to enter into a business, *i.e.* accepting Chevron credit cards.  As such, the RAN System-related charges would ordinarily constitute franchise fees.  However, as explained by Chevron, these charges are excepted from the general franchise fee definition because they were apparently offered at fair market value.  Chevron offers testimonial evidence by Kevin Knape, Team Leader for its North America Systems group, that explains how RAN System equipment and services are priced to provide an approximate six to eight percent return. (Ct. Rec. 59 ¶¶ 4 & 6.)  Chevron's evidence of fair market pricing is not rebutted by MOC, which only referred to what a similar system would cost if outright purchased, rather than rented and regularly serviced.  Because MOC fails to rebut Chevron's claim it offered the RAN System at a fair market value, the Court grants summary judgment on this issue in favor of Chevron and holds the RAN System charges do not constitute franchise fees regardless of the credit card exception discussed above.

The Court also denies summary judgment on MOC's claim that training fees associated with the RAN System constituted a franchise fee. Although MOC asserts it was required to pay training fees relating to the RAN System it failed to provide any evidence it actually did pay or agreed to pay for such training.  Instead, as Chevron suggests, it appears MOC never did pay nor agree to pay for training.  Additionally, no such training fees were required or agreed to as part of MOC's ability to process Chevron Credit cards because the introductory training was free.  Any additional training was not mandated to use the RAN System and unnecessary to conduct this business.

**F. Commitment to Service Excellence Program ("CTSE Program") Payments**

In 1995 and 1996, MOCS was loaned approximately $3.1 million by Chevron to remodel existing stores and to build new locations. (See Ct. Rec. 13 at Ex. 4; Ct. Rec. 58 at Ex. K-M.)  By the terms of the agreements, these loans were to be forgiven over the course of ten years if MOC purchased sufficient volumes of motor fuel from Chevron.  Letters sent by Chevron to MOCS regarding these loans, indicate the loans were being granted in "response to an offer made to [MOC] by a competing supplier that wishe[d] to supply motor fuel to [MOC] for resale. . . ." *Id.*  Additionally, each letter contains a term that included language similar to the following:

> In consideration of the Loans, you will cause the Outlets to meet Chevron's Hallmark 21 retail image standards for complete rebuilds [ ] or major rebuilds [ ] under Chevron's Jobber Investment Incentive Program . . . .

*Id.* Those retailers obligated to conform to the Hallmark 21 retail image standards were required to participate in Chevron's Service and Satisfaction Program, which is also known as the CTSE Program. (Ct. Rec. 13 at Ex. 5, MOCC 81760.)  The CTSE Program required participation fees ranging from $200-$425 per retail location. (Ct. Rec. 13 at Ex. 7, MOCC 80382.)  MOC claims it paid $425 per location to participate. (Ct. Rec. 13 ¶ 12.)  The CTSE Program provided customer service-related training to Chevron retail outlet owners and employees.

MOC believes the fees it paid for the CTSE Program constitute franchise fees because they were either required or agreed to for the right to enter into a business, namely Chevron motor fuel sales.  Chevron counters, claiming these fees and MOC's participation in the CTSE Program were not necessary for MOC to sell its fuel, but only required if MOC wanted to receive Chevron's improvement loans.  Thus, Chevron does not

ORDER ~ 11

believe the CTSE Program fees were franchise fees because they were not required nor agreed to for the purpose of doing business, but rather to obtain loans.

MOC responds to Chevron's argument by claiming MOC was forced to accept the loans requiring it to comply with the Hallmark 21 retail image standards and pay fees to participate in the CTSE Program in order to secure a jobbership. In support of this position, MOC points to an April 18, 1995, letter detailing Chevron's understanding of the parties' tentative jobbership and loan agreements. (Ct. Rec. 64 at Ex. A.) The letter states:

> Neither party shall have any obligation hereunder unless and until Chevron and Maid O'Clover enter into a definitive Chevron Branded Jobber Petroleum Agreement, cash advance agreements and mortgages in a form acceptable to both Chevron and Maid O'Clover.

*Id.* Chevron disagrees, claiming the loan agreements were voluntarily entered into by MOC and not a prerequisite to its granting of a jobbership to MOC. Chevron supports its position with numerous letters from MOC, which express its desire to obtain loans from Chevron. (Ct. Rec. 261 at Ex. C-G.)

Whether MOC was required to accept $3.1 million in loans from Chevron and participate in the fee based CTSE Program is a materially disputed issue of fact that precludes the Court from determining whether the CTSE Program fees constitute franchise fees. If MOC was not required to accept the loans and consequently participate in the CTSE Program, the resulting fees would not be considered franchise fees because they were not required or agreed to gain the right to sell Chevron fuel, but rather only to secure improvement loans. However, the opposite is true if

Chevron actually had required MOC enter the loan agreements and improve its outlets before Chevron would award MOC a jobbership.  Thus, the Court reserves this issue for the jury and denies both motions with regard to this issue.

**G. Business Development Fund Program ("BDF Program") Participation**

As noted above, hidden fees in the cost of goods or services have been found to constitute franchise fees. *See Blanton*, 721 F.2d at 1220 (quoting *Lobdell v. Sugar 'N Spice, Inc.*, 33 Wash. App. 881, 892 (1983)). MOC believes Chevron was charging it a $0.0015 hidden fee on every gallon of motor fuel it purchased while operating as a jobber, under the guise of Chevron's BDF Program.  Under the BDF Program, Chevron would reimburse jobbers for expenditures approved by Chevron and designed to develop the jobber's business, *i.e.* training, marketing, etc. (Ct. Rec. 13 at Ex. 8.) Each year a fund would automatically accumulate for each jobber at a rate of $0.0015 per gallon of fuel it purchased.  Upon application, these funds were remitted to jobbers to cover up to fifty percent of certain expenses.  Funds were forfeited by the jobber if not used on an annual basis.

MOC believes the BDF Program was a method Chevron used to extract and compel the use of jobber funds for Chevron's benefit.  According to MOC, the $0.0015 charge was a hidden cost, which jobbers should have had the right to refuse if they did not wish to participate in the BDF Program, thus lowering the cost of motor fuel purchases.  Because the alleged charge was required for MOC to conduct its jobber business with Chevron, MOC believes the cost must be considered a franchise fee.

ORDER ~ 13

Chevron does not believe the BDF Program funds constitute franchisee fees because the program is wholly funded by Chevron itself, not by the jobbers.  For Chevron, the $0.0015 that accrues with each gallon is not an added charge to the price of motor fuel, but merely a method of tracking which jobbers deserve to benefit from the BDF Program the most. Mr. James Lang, Financing and Relationship Coordinator for Chevron, explains that "Chevron funds Jobbers' BDF Balances from Chevron's own funds" and that "Jobbers are not required to pay Chevron any charge or fee to participate in the BDF Program. . . ." (Ct. Rec. 61 ¶ 2.)  These statements are contrasted by a letter written by a Chevron executive to a Chevron Jobber, which introduces and describes the BDF Program.  In the letter, Chevron indicates the "program will be funded by *your purchases*. . . ." (Ct. Rec. 13 at Ex. 9.)  Thus, implying the BDF Program is actually funded by the jobbers themselves and not from independent Chevron funds.

The discrepancies between the Chevron Jobber Letter and Mr. Lang's statement illuminate the existence of a genuine dispute of material fact between the parties as to the nature of the BDF Program fund.  If it is jobber funds, the $0.0015 certainly constitutes a franchise fee paid by MOC for the right to act as a jobber.  However, if the fund indeed is Chevron funded and merely a method for encouraging jobber development, there is no franchise fee.  Thus, summary judgment on this issue is denied for both parties.

**H. Wholesale Motor Fuel Prices**

In its responsive brief to Chevron's motion for summary judgment, MOC contends Chevron was not charging a bona fide wholesale price for its

1  motor fuel, and thereby charging a hidden fee in the amount it was
2  overcharging jobbers, who were required to pay for overpriced product due
3  to their contractual obligations.  In response, Chevron disagrees with
4  MOC's assertion, arguing as it has in other motions that its wholesale
5  rack prices were competitive with other branded and unbranded wholesale
6  rack prices.  For the same reasons addressed in Chevron's Pricing Motion,
7  the Court concludes a disputed issue of material facts exists as to
8  whether Chevron was offering motor fuel to jobbers at a bona fide
9  wholesale price.  If Chevron was, then MOC's assertion is barred by
10 R.C.W. 19.100.010(12)(a)'s bona fide price exception.  Thus, summary
11 judgment is denied on this issue.

12      Accordingly, **IT IS HEREBY ORDERED:**

13      1. Plaintiffs' Motion for Partial Summary Judgment, **(Ct. Rec. 48),**
14 is **DENIED;** and

15      2. Defendant Chevron U.S.A., Inc.'s Motion for Partial Summary Under
16 Washington's Franchise Investor Protection Act, **(Ct. Rec. 204),** is
17 **GRANTED IN PART** (credit card exception and RAN system fees) and **DENIED**
18 **IN PART** (CTSE program, BDF program, and wholesale motor fuel prices).

19      **IT IS SO ORDERED.**  The District Court Executive is directed to enter
20 this Order and provide a copy to counsel.

21      **DATED** this ____16th____ day of September, 2005.

23              ___S/ Edward F. Shea_____

24                      EDWARD F. SHEA
                 United States District Judge

26 C:\Documents and Settings\hernandez\Local Settings\Temp\notes6030C8\3077.msj.FIPA.wpd